IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT L. GANOE, SR.,** | : | |
| **Plaintiff** | : | **No. 1:20-cv-00663** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **SECRETARY OF DEFENSE PETE** | : | |
| **HEGSETH,** | : | |
| **Defendant** | : | |

## MEMORANDUM

In this employment discrimination action, Plaintiff Robert L. Ganoe, Sr. ("Plaintiff")

sued Defendant Secretary of Defense Pete Hegseth ("Defendant")[1] alleging that Plaintiff was

removed from his employment with the Defense Logistics Agency ("DLA") of the United States

Department of Defense for alleged misconduct that he avers was pretextual.  (Doc. No. 1.)

Defendant has moved for summary judgment.  For the following reasons, the Court will grant

Defendant's motion for summary judgment except that Plaintiff's whistleblower claim will be

dismissed for lack of jurisdiction.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff was employed by DLA as a General Supply Specialist (Instructor) from April 6,

2009 (id.), until he was terminated on November 19, 2018 (Doc. No. 1-5 at 2).  On April 21,

2020, Plaintiff filed a complaint alleging he was "subjected to age and disability discrimination;

whistleblower reprisal and retaliation; and was ultimately terminated from his federal

---

[1]  Secretary Pete Hegseth became the Secretary of Defense on January 25, 2025, succeeding
Secretary Lloyd J. Austin III.  Plaintiff initially brought suit against Secretary Austin, but
pursuant to Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically
substituted as a party in an action brought against the public officer in an official capacity.

employment because of his age, disability, and/or for having engaged in protected EEO and whistleblower activities." (Doc. No. 1 ¶ 5.) Plaintiff asserts the following claims against Defendant: violation of the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 2302 (Count I); violation of the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 1221 (Count II); and age and disability discrimination and/or hostile and retaliatory work environment in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 633a, et seq., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 (Count III). (Id. at 4–8.)

The Court briefly addresses the lengthy course of discovery in this case, including the parties' discovery disputes. In November 2020, Defendant propounded a demand for "Plaintiff's federal, state, and local tax returns filed within or outside the United States of America, along with all schedules, W-2s, and paystubs, for the years ending December 31, 2009 to the present" in connection with Plaintiff's potential claim for damages, assuming Plaintiff could establish liability. (Doc. No. 57-2 ¶ 11.) Plaintiff objected to the demand on several grounds but agreed to "provide his tax returns from his removal forward, upon further request and limitation of this inquiry," and his counsel later agreed to provide three (3) years' worth of tax returns and requested an order directing Plaintiff to produce the same. (Doc. Nos. 20, 57-2.) The Court ordered Plaintiff to do so and subsequently ordered him to produce a copy of his 2021 tax return, with appropriate redactions to prevent disclosure of his wife's confidential and financial information. (Doc. Nos. 20, 50.)

In December 2022—two years after Defendant propounded his discovery demand for the tax returns—Defendant informed the Court that Plaintiff had yet to produce the tax returns in

2

compliance with the Court's Orders.  (Doc. No. 51.)[2]  The Court then set a briefing schedule for

the filing of a motion to compel production of the tax returns.  (Doc. No. 56.)  In response,

Defendant filed a timely "Motion to Compel Plaintiff's Compliance with Court Orders," by

which Defendant sought an order: (1) compelling Plaintiff to produce complete copies of what

Defendant asserts are unsigned, overly redacted, and incomplete tax returns; and (2) sanctioning

Plaintiff by dismissing this action, or imposing lesser sanctions.  (Doc. No. 57.)  The parties fully

briefed the motion (Doc. Nos. 58–60), and on March 8, 2023, the Court granted it in part (Doc.

No. 61). Specifically, the Court directed Plaintiff to produce his tax returns in compliance with

the Court's Orders and, regarding sanctions, ordered him to pay reasonable attorneys' fees

incurred by Defendant in connection with the motion to compel/for sanctions and the then-

forthcoming motion for attorney's fees.  (Doc. No. 62 at 2.)  The Court directed Defendant to

submit, with any motion for attorneys' fees, documentation supporting an award of a specific

amount of fees incurred as a result of the relevant motions.  (Id.)

     In response to the Court's March 8, 2023 Order, Defendant filed a motion for attorney's

fees.  (Doc. No. 63.)  Less than one week later, Defendant filed a letter informing the Court that

Plaintiff had still not provided full copies of his original, signed, and completed tax returns

pursuant to the Court's March 8, 2023 Order.  (Doc. No. 64.)  In the same letter, Defendant

detailed the efforts made to obtain complete copies of the tax returns and attached an email in

---

[2]  Until 2023, the Court attempted to resolve the parties' many discovery disputes surrounding the tax returns by scheduling conferences with the parties and entertaining informal letter briefing.  (Doc. Nos. 12–15, 18–22, 46–48, 50–51, 53, 55–56, 64–65, 67.)  Throughout the life of this case, the Court also granted several extensions of time to complete discovery, in large part due to Plaintiff's failures to produce the tax returns.  (Doc. Nos. 17–18, 29–31, 33–34, 36–39, 44–45, 49–50, 52, 54, 56, 69, 71–73.)

which Plaintiff's counsel represented that he would provide authorizations to allow Defendant to obtain them but did not offer any reason why Plaintiff failed to provide the documents by the Court-ordered deadline.  (Doc. Nos. 64, 64-1.)  After the parties briefed the motion for attorney's fees (Doc. Nos. 66–68), on June 15, 2023, the Court issued a Memorandum and Order granting Defendant's motion and directing Plaintiff to pay Defendant $5,250.00 in attorney's fees (Doc. Nos. 70–71).  The Court also granted Defendant's unopposed motion for an extension of case management deadlines (Doc. No. 69), and set expert report deadlines (Doc. No. 71 at 1).

Thereafter, on July 26, 2023, Defendant filed an unopposed motion to extend case management deadlines "by 60 days from the date the Internal Revenue Service (IRS) provides Plaintiff's W-2s and 1099s."  (Doc. No. 72 at 1.)  The Court granted the motion and stated that "[u]pon receipt of Plaintiff's W-2s and 1099s from the IRS, Defendant's counsel shall file a notice with this Court and a proposed order extending the remaining case deadlines by 60 days thereafter."  (Doc. No. 73.)

On August 12, 2024, the Court issued an Order directing the parties to file a status report. (Doc. No. 74.)  The parties filed a joint status report on August 23, 2024 and averred that Defendant's counsel had not received the W-2s or 1099s from the IRS.  (Doc. No. 75 at 1.)  On October 31, 2024, the Court conducted a telephone status conference with the parties and set a briefing schedule for motions for summary judgment as to the issue of Defendant's liability, noting that the documents sought from the IRS pertained only to Plaintiff's potential damages assuming liability is established.  (Doc. Nos. 77–78.)  On January 31, 2025, Defendant filed a motion for extension of time to file a motion for summary judgment, in which Plaintiff did not concur.  (Doc. Nos. 79, 79-1.)  On February 28, 2025, the Court granted the motion and set a

deadline of March 17, 2025 for the filing of Defendant's summary judgment motion. (Doc. No. 80.)

In early March 2025, Defendant filed a motion to seal and to submit documentation in camera along with the proposed documents, which were filed provisionally under seal. (Doc. Nos. 81–83.) Upon consideration of the motion, the Court issued a Show Cause Order directing Defendant to show cause as to why sealing was warranted under the standards established by the United States Court of Appeals for the Third Circuit in In re Avandia Marketing, Sales Practices and Products Liability Litigation, 924 F.3d 662 (3d Cir. 2019). (Doc. No. 84.) On March 17, 2025, Defendant filed another motion for extension of time to file a motion for summary judgment, in which Plaintiff did not concur. (Doc. No. 85.) Thereafter, on March 21, 2025, Defendant filed a response to the Court's Show Cause Order. (Doc. No. 86.)

On April 30, 2025, Defendant filed an unopposed motion to submit redacted documents pursuant to the parties' confidentiality order (Doc. No. 87) as well as a concurred-in "motion to seal and to submit documentation in camera" (Doc. No. 88) with a submission filed provisionally under seal (Doc. No. 89). The next day, Defendant filed another motion for extension of time to file a motion for summary judgment, in which Plaintiff did not concur. (Doc. No. 90.) Upon consideration of these motions, the Court issued an Order on May 2, 2025 directing Defendant to file a brief in support of the relief requested in the motions at Docket Numbers 81, 87, and 99. (Doc. No. 91.) Defendant accordingly filed briefs in response to the May 2, 2025 Order. (Doc. Nos. 92–94.) On July 24, 2025, the Court issued a Memorandum and Order (Doc. Nos. 95, 96) denying as moot Defendant's motion to seal and submit documentation in camera (Doc. No. 81), granting Defendant's motion to submit redacted documents pursuant to the parties' confidentiality stipulation (Doc. No. 87), granting Defendant's motion for extension of time to

file a motion for summary judgment (Doc. No. 90), and denying as moot Defendant's prior motion for extension of time (Doc. No. 85).

After the Court granted Defendant leave to file excess pages in its brief in support of its motion for summary judgment (Doc. No. 99), Defendant filed its motion for summary judgment on August 7, 2025 (Doc. No. 100), along with its brief in support (Doc. No. 101), and its statement of material facts and exhibits in support (Doc. Nos. 102, 103).  On August 26, 2025, Plaintiff moved for an extension of time to respond to Defendant's motion for summary judgment.  (Doc. No. 104.)  The Court granted the motion and ordered Plaintiff to file any response no later than October 14, 2025.  (Doc. No. 105.)  On November 20, 2025, the Court issued another Order extending Plaintiff's filing deadline until November 25, 2025, pursuant to Chief Judge Brann's District-wide Order staying all civil actions in which the United States or an agency or an officer thereof is a party, in consequence of the lapse in appropriations.  (Doc. No. 106.)  On November 25, 2025, Plaintiff filed his brief in opposition to Defendant's motion for summary judgment (Doc. No. 108) and his response to Defendant's statement of material facts and exhibits in support (Doc. Nos. 107, 107-1, 107-2).  After the Court granted Defendant another extension of time (Doc. No. 110), and granted Defendant leave to file excess pages (Doc. No. 113), Defendant filed its reply brief in support of its motion for summary judgment (Doc. No. 114).  Defendant's motion for summary judgment is now ripe for disposition.

### B.    Factual Background[3]

Robert L. Ganoe, Sr. is over 40 years old, and was employed as a General Supply

---

[3] The following relevant facts of record are taken from Defendant's statement of material facts (Doc. No. 102) ("SMF") and Plaintiff's response to Defendant's statement of material facts (Doc. No. 107) ("RSMF").  Each filing contains specific citations to the record at each numbered paragraph.  The facts are undisputed unless otherwise noted.

Specialist (training instructor) with Human Resources Services within the DLA, an agency within the U.S. Department of Defense, in New Cumberland, Pennsylvania from 2013 until his removal on November 19, 2018.  (Doc. No. 102 ¶¶ 1, 3.)  The DLA provides worldwide logistics support for the U.S. military, and DLA training instructors provide on-site training throughout the United States, Europe, and the Middle East.  (Id. ¶¶ 3, 4.)  Prior to his role as a training instructor, Plaintiff was a DLA Police Officer Instructor with DLA Installation Support since April 6, 2009.  (Id. ¶ 2.)

On October 16, 2014, Plaintiff filed a complaint with the DLA Office of Inspector General ("OIG") against three employees of DLA Human Resources Services—former DLA Human Resources Services Division Chief Deron Haught, Branch Chief Kimberly Shearer, and former Branch Chief Laura Hooper—alleging a hostile work environment, in particular "questionable temporary duty (TDY) practices, training assignments, time and attendance sheet submissions, promotions, and disciplinary practices."  (Id. ¶ 6.)  These allegations were referred to DLA Human Resources Services.  (Id. ¶ 13.)  Following the investigation, "it was determined that Ganoe's allegations were not substantiated and it was recommended that the hotline complaint be closed."  (Id. ¶ 15.)  On December 11, 2015, the DLA OIG advised Plaintiff that it was closing the preliminary inquiry into his 2014 OIG hotline complaint.  (Id. ¶ 19.)  The DLA OIG received another complaint from Plaintiff on June 6, 2016.  (Id. ¶ 23.)  The OIG substantiated some of the allegations, did not substantiate others, and closed the investigation in March 2017.  (Id. ¶¶ 23–37.)

Plaintiff also filed an equal employment opportunity ("EEO") complaint on April 4, 2016, in which he alleged a hostile work environment because of his age, disability, and due to

reprisal for his EEO complaint.  (Id. ¶ 38.)[4]  In particular, he alleged in his EEO complaint that:

1.      Management at DLA Training refused Ganoe training and/or development;
2.      Management forced work assignments on Ganoe;
3.      Management assigned junior (new) instructors to advanced/career developmental course;
4.      Management assigned Ganoe more courses to instruct because of his known medical travel restrictions;
5.      Management issued letters of counsel to Ganoe; and
6.      Ganoe was denied special course or assignments without reasonable accommodations.

(Id.)

Plaintiff requested and was approved for the "AMMO 62" training course in June 2015. (Id. ¶ 39.)  He requested to take this course as professional development, but did not have any "operational requirement to attend" the course.  (Id. ¶¶ 40–41.)[5]  He was removed from the "AMMO 62" course by the DLA Training Forward Presence team—not by his supervisors—in order to make room for other employees who had an operational requirement to attend the course.  (Id. ¶ 42.)[6]  Plaintiff was also approved for the "HAZMAT certification course" in April

---

[4]  Numerous times, Plaintiff states in his response to Defendant's SMF that a fact is "[a]dmitted in part for the purpose of this Motion."  See, e.g. (Doc. No. 107 ¶¶ 38, 39, 47, 53, 55, 58). However, Plaintiff does not specify which parts of each statement are supposedly admitted and which parts are not, nor does he supply any reasons for these partial admissions or citations to the record in support thereof.  As such, the Court will treat these responses as admissions.

[5]  Plaintiff purports to deny paragraph 41, but does not support his denial with any citation to the record, in violation of this Court's Local Rules.  See Local Rule 56.1 (requiring that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements," and stating that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party"). Because Plaintiff does not genuinely deny the facts asserted in paragraph 41, the facts set forth therein will be deemed admitted.

[6]  Plaintiff admits this paragraph in his RSMF (Doc. No. 107 ¶ 42), however in his accompanying affidavit, he states "I was removed from the AMMO 62 course, and Forward Presence employees told me it was retaliatory" (Doc. No. 107-1 ¶ 42).  Although Plaintiff's two

2015 (id. ¶ 43) but was "bumped from the course because other employees that were required to have that training to perform their job duties needed his slot" (id. ¶ 45).  In November 2015, Shearer asked Plaintiff whether he was available to attend an "AIC" course in April, June, or August 2016 but Plaintiff "responded that he was not scheduling any training due to his daughter's graduation from the police academy."  (Id. ¶¶ 47–48.)  Plaintiff was also scheduled to attend the "AIC" course in October 2016 but withdrew due to family issues.  (Id. ¶ 49.)  Then in October 2017, he had to withdraw from the "AIC" course for personal reasons.  (Id. ¶ 50.)  Defendant asserts that Plaintiff "failed to timely respond to his then supervisor" regarding his availability for a March 2018 "Foundation Instructor Facilitator Course" (id. ¶ 51), although Plaintiff disputes this, asserting that he was "on TDY and did not have access to my work email" when they sent the request (Doc. No. 107 ¶ 51).  When asked whether he could attend the training in June 2018, Plaintiff responded that he would be on leave.  (Doc. No. 102 ¶ 52.)

DLA training instructors are assigned courses "based upon the DLA's mission and resources and the customer's needs" (id. ¶ 53) and assignments and workload "fluctuate depending on instructor[] availability, mission requirements, and customer[] needs" (id. ¶ 55).

---

statements appear to be in conflict, the Court need not resolve the incompatibility because in neither the RSMF nor the affidavit does Plaintiff cite to any support in the record for the statement that "Forward Presence employees told me it was retaliatory" (Doc. No. 107-1 ¶ 42) or supply specific facts, rather than vague or conclusory statements. See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) (internal citations omitted) (articulating that "[i]t is true that conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment" and that instead "the affiant must set forth specific facts that reveal a genuine issue of material fact").  As such the Court will deem the asserted facts set forth in this paragraph admitted. See Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (stating that the court was "troubled by plaintiff's failure to provide proper citations to the appendix"); Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023) (stating that a party "may not rely merely on vague statements to defeat summary judgment") (internal quotations omitted).

From 2013 until June 2016, Plaintiff taught "Performance Oriented Packaging" and "Electrostatic Discharge Sensitive Items." (Id. ¶ 56.) His workload was "comparable to his co-workers." (Id. ¶ 57.) Plaintiff was asked to teach an additional course, "Stock Readiness/Shelf Life," but ultimately was not required to teach it because he told his supervisor that "he did not like it, was uncomfortable working with the West Coast instructor, and the subject matter experts at DLA Distribution were not willing to share information with him." (Id. ¶ 58.) He was also assigned a "Hazardous Processing in DSS" course, but was not required to teach it due to a division reorganization. (Id. ¶ 59.) Although any DLA course "has the potential to assist in career development," the DLA does not have specific career development courses for its training instructors, and Plaintiff "had similar professional development to his peers." (Id. ¶¶ 60–62.)

On August 12, 2015, Plaintiff's supervisor Shearer asked if he had any travel limitations because she was planning the 2016 fiscal year workload. (Id. ¶ 63.) Plaintiff had previously advised Shearer that he was experiencing neck and back issues, which made travel uncomfortable, and that he was seeking medical attention for these issues. (Id. ¶ 64.) On or about October 26, 2015, Plaintiff provided Shearer with medical documentation describing his travel restrictions: "(1) no flights longer than three hours consecutively and (2) no travel that does not allow standing, walking, and stretching at any interval greater than one hour." (Id. ¶ 65.) In November 2015, Plaintiff was accommodated outside of the formal reasonable accommodation process for the medical documentation that he had provided. (Id. ¶ 66.) Shearer and Haught informed Plaintiff that he was granted a reasonable accommodation of fifteen-minute breaks after every hour of driving for travel. (Id. ¶ 67.) Plaintiff was also granted the following accommodations: he was permitted to select flights with a one-hour layover after three hours of flying; the DLA adjusted his fitness hours during winter months so that he could go home and

run five miles before sunset; and he was advised that he would not be assigned any overseas work assignments and that west coast courses would be assigned to other instructors. (Id. ¶¶ 68–70.) Since beginning his work at DLA training in 2013, Plaintiff did not travel overseas, to the west coast, or to the central United States. (Id. ¶ 72.)

Plaintiff was subject to discipline on several occasions. On November 15, 2013, he received an "oral admonishment" for "failure to attend meetings, lack of effort regarding the transition of an assigned course, and disparaging comments about management."[7] (Id. ¶ 73.) On March 20, 2014, he received a letter of reprimand from Haught, his second-line supervisor, due to a PowerPoint presentation that he sent by email to Shearer. (Id. ¶ 74.) The presentation was entitled "MY FAVORITE PHILOSOPHY @ DLA J1" and one of the slides stated: "[w]hile seeking revenge @J1, dig two graves—one for yourself, but theirs first." (Id. ¶¶ 75–76.) Plaintiff told Haught that he accidentally sent the wrong version of the presentation, and that he did not create the presentation. (Id. ¶¶ 77–78.) Plaintiff was advised that he must refrain from sending communications that are "disrespectful, derogatory, or inflammatory so that further disciplinary action would not be necessary." (Id. ¶ 82.) On December 18, 2014, Shearer issued a letter of warning to Plaintiff for an email that Plaintiff sent to acting branch chief John Lesko, which stated: "[t]hanks John but still does not answer my question but it does show what a 'Supervisor' should not do. Awesome job! Have a great day!" (Id. ¶¶ 83–84.) Shearer

---

[7] Plaintiff denies this paragraph, claiming in his RSMF that the relevant entry in the discipline log was "based on Shearer's false statements" (Doc. No. 107 ¶ 73), an assertion that he repeats in his affidavit in support (Doc. No. 108 ¶ 56). However, Plaintiff provides no detail as to the alleged falsity of the statements, nor does he support his assertion with citations to the record. As described several times supra, vague or bare assertions are insufficient, and the Court will deem the facts set forth in this paragraph admitted. See Nitkin, 67 F.4th at 571 (stating that a party "may not rely merely on vague statements to defeat summary judgment").

encouraged Plaintiff to share his comments and concerns with leadership in a professional and tactful manner.  (Id. ¶ 85.)  Plaintiff was also advised that if the warning did not change his behavior, he would be subject to disciplinary action.  (Id. ¶ 86.)  Shearer issued another letter of warning to Plaintiff on December 15, 2015.  (Id. ¶ 93.)  This time, a customer had "complained that Ganoe interrupted a receiving class taught by another DLA Training instructor."  (Id. ¶ 87.)  In November 2016, Plaintiff was issued another letter of warning for failing to follow instructions by supervisor Phillip Gulley, specifically by failing to complete the required annual employee "Right to Know training" as instructed.  (Id. ¶¶ 117–19.)[8]  Plaintiff was advised that similar incidents of misconduct in the future may result in disciplinary action.  (Id. ¶ 122.)

On April 17, 2017, Plaintiff was issued a letter of reprimand for allegedly unprofessional conduct that occurred between December 2016 and February 2017.  (Id. ¶ 133.)  One of Plaintiff's co-workers, Shane Rapsey, reported that in December 2016, Plaintiff referred to him as a "pussy ass bitch," and another co-worker confirmed that he heard Plaintiff say "hey you pussy ass bitch" to Rapsey.  (Id. ¶ 123-24.)[9]  Rapsey reported that Plaintiff separately called him an "asshole" and "ass kisser" (id. ¶ 125) and it was also reported that during this conversation Plaintiff called their supervisor a "doofus" or "douche bag" or words to that effect (id. ¶ 126).  In February 2017, Shearer reported that she overheard Plaintiff refer to another co-worker as an

---

[8]  Plaintiff states in his RSMF that he does not recall these asserted facts.  Because the facts are uncontroverted, the Court will deem them admitted.  See Local Rule 56.1 (stating that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party").

[9]  Plaintiff denies paragraph 123, asserting: "I did not use the word 'pussy ass bitch' together." (Doc. No 107 ¶ 123.)  This denial does not actually deny the asserted fact—that Mr. Rapsey reported that Plaintiff called him those words.  Accordingly, the Court will deem these facts admitted.

"idiot" and a co-worker confirmed that Plaintiff told him to "sit at that idiot's desk." (Id. ¶¶ 127–28.) In the letter of reprimand, Plaintiff was warned that future similar incidents may result in more severe disciplinary action. (Id. ¶ 136.) Plaintiff sought to have the letter of reprimand rescinded, but his request was denied. (Id. ¶ 137.)

In September 2017, Rapsey filed a complaint against Plaintiff, alleging that Plaintiff referred to Rapsey as "gay boy." (Id. ¶ 138.)[10] Rapsey also stated that Plaintiff asked Rapsey about his "boyfriend" when questioning him about his whereabouts. (Id. ¶ 139.) During the investigation of the complaint, another co-worker also stated that Plaintiff referred to Rapsey as "gayboy" and referred to Rapsey and a co-worker as "Barbie Bros." (Id. ¶ 141.) That co-worker further stated that every time Plaintiff spoke about Rapsey or another co-worker Garcia, he used the names "gay boy" or "boyfriend." (Id. ¶ 144.) This co-worker described, as a result, that "walking on 'egg shells' and people not feeling comfortable in the office does not make for a good work environment." (Id. ¶ 145.) When Plaintiff's first-line supervisor met with Plaintiff about the complaint, Plaintiff claimed he did not recall using these terms. (Id. ¶¶ 146–48.)

Effective July 24, 2017, the DLA Training division chief issued a memorandum directing employees of the proper procedures to request leave, in particular "to specify a particular type of requested leave, i.e., either as paid (annual, sick, travel, comp, or credit) or unpaid (leave without pay)." (Id. ¶ 151.) On December 14, 2017, Plaintiff texted Brenner, his first-line supervisor, to advise him that he was taking leave; Brenner asked Plaintiff to specify, "per the MOI . . . your specific type of leave (either as paid (annual/sick/travel comp/credit) or unpaid (LWOP)," to

---

[10] Plaintiff, in his RSMF, states that this paragraph is "[a]dmitted in part that Rapsey filed a workplace [sic]." (Doc. No. 107 ¶ 138.) For the same reasons articulated several times supra, the Court will deem the facts admitted.

13

which Plaintiff responded "[p]aid, now stop bothering me;" Brenner responded "Bob you have not answered the question what type of paid leave?," but Plaintiff did not respond and Brenner did not approve the leave request.  (Id. ¶¶ 152–63.)

Between August 25, 2017 and November 24, 2017, Brenner repeatedly directed Plaintiff to "update the functional course library folders for managed courses by a specific date," but Plaintiff "failed to update the functional course library folders as directed."  (Id. ¶¶ 164–65.)[11] DLA management also repeatedly directed Plaintiff to submit "properly completed travel computation" documents.  (Id. ¶ 166.)  Plaintiff refused to complete the documents as directed. (Id. ¶ 167.)[12]

On February 14, 2018, Brenner issued a notice of a proposed 14-day suspension to Plaintiff for alleged unprofessional conduct and failure to carry out a proper order.  (Id. ¶ 168.) The charge of unprofessional conduct was supported by the following four incidents:

  1.    Between November 26, 2017 and December 4, 2017, Ganoe referred to his co-workers, Shane Rapsey and Javier Garcia, as "barbie brothers," or words to that effect;

  2.    Between November 26, 2017 and December 4, 2017, Ganoe asked a male co-worker, Matt Reis, "[w]here is your boyfriend?" referring to another co-worker, Shane Rapsey;

  3.    Between November 28, 2017 and January 5, 2018, in seven emails, Ganoe addressed his fourth-line supervisor, Michael Beaupre, as "Mike" or "Michael," despite Beaupre's explicit instruction directing Ganoe to address him as "Mr. Beaupre" and not by his first name; and

---

[11]  Plaintiff purportedly denies these asserted facts, stating that he "was non [sic] longer the course manager," and that updating the folders "was only required by certain employees" (Doc. No. 107 ¶¶ 164–165), but Plaintiff does not dispute that he "failed to update the . . . folders as directed."  (Doc. No. 102 ¶ 165).  The asserted facts in this paragraph will be deemed admitted.

[12]  Plaintiff again purports to deny the asserted facts in this paragraph without actually denying that he refused to carry out the directive.  The asserted facts in this paragraph will be deemed admitted.

14

4.      On December 14, 2017, when Ganoe's first-line supervisor, Don Brenner, asked him what type of leave he was requesting to take that day, Ganoe refused to answer and told Brenner "[p]aid, now stop bothering me," despite being reminded that the Memorandum of Instruction for Requesting Leave and Call off Procedures requires employees, in call off situations, to report their absence and the specific type of leave they are requesting, i.e., paid (annual, sick, travel, comp, or credit) or unpaid leave (leave without pay), for accountability purposes and so that the supervisor can review the employee's leave balance, and once validated, approve the leave request.

(Id. ¶ 169.)  The charge for failure to carry out a proper order was supported by the following:

1.      [Plaintiff] repeatedly failed to carry out his supervisor's order to update the functional course library folders for managed courses, specifically Performance Oriented Packaging course materials; and

2.      Between November 2, 2017 and the date of the proposed suspension, Ganoe repeatedly failed to follow management's orders to submit properly completed travel computation worksheets, which is required of all DLA Training employees.

(Id. ¶ 170.)  The suspension letter also noted that Plaintiff was currently under a letter of reprimand for unprofessional conduct for demeaning comments to co-workers.  (Id. ¶ 171.) Plaintiff, in his reply to the proposed suspension, denied that he violated any rules, regulations, or laws, and claimed that Rapsey made false and inaccurate allegations against him.  (Id. ¶ 172.)

On April 9, 2018, Plaintiff was informed by the chief of DLA Human Resources Services that a 14-day suspension was appropriate and necessary to maintain discipline and to promote the efficiency of federal service.  (Id. ¶ 173.)  Plaintiff was suspended from April 16, 2018 through April 29, 2018.  (Id. ¶ 176.)

On April 11, 2018, when a co-worker's computer froze during a training session, Plaintiff asked the co-worker why their computer was not working, after which Plaintiff said "it's because of all the porn you watch on your computer."  (Id. ¶ 189.)  When Brenner met with Plaintiff about these alleged comments, Plaintiff claimed he did not recall making them.  (Id. ¶ 192.)

15

On the day that Plaintiff was supposed to return to work following his 14-day suspension, he texted Brenner that he would not be in that day. (Id. ¶ 193.) Brenner responded: "Bob good morning. What type of leave are you requesting?" but did not receive a response from Plaintiff. (Id. ¶¶ 194–95.)

DLA Training employees are required to complete a "project code tracker" every pay period. (Id. ¶ 206.) DLA customers purchase DLA Training classes and other services and DLA Training uses the revenue to fund employee salaries. (Id. ¶ 208.) The reporting system "depends on the accurate and consistent use of project codes." (Id. ¶ 209.) All DLA Training employees send their supervisor a project code tracker at the end of the pay period. (Id. ¶ 210.) On May 25, 2018, Brenner noticed errors in Plaintiff's project code tracker for the current pay period and emailed Plaintiff to instruct him to correct the errors. (Id. ¶¶ 212–13.) Brenner instructed Plaintiff again on May 31, 2018 to correct the errors. (Id. ¶ 215.) On June 1, 2018, Brenner went to Plaintiff's desk to discuss his failure to correct and return his project code tracker; Plaintiff indicated he would correct the document but stated that he believed it was not necessary. (Id. ¶¶ 216–18.) After this discussion, Brenner sent an email instructing Plaintiff to return the corrected project code tracker by noon that day. (Id. ¶ 220.) Plaintiff never provided a corrected version. (Id. ¶ 221.)

On August 14, 2018, the chief of DLA Human Resources Services issued a notice of proposed removal to Plaintiff for "unprofessional conduct, failure to carry out a proper order, and failure to follow established call off procedures." (Id. ¶ 222.) The charge of unprofessional conduct was based upon:

> (1) during a meeting with his first-line supervisor, Brenner, Ganoe slammed the office door and in a raised voice stated "you better be careful with that you say next"; (2) stating to co-worker in front of other employees about computer not

working due to all the porn the co-worker watches on it; (3) ignoring supervisor's request to clarify the leave he was using when returning from a 14-day suspension; and (4) refusing to meet with his supervisor to discuss work related concerns, including the next year's training schedule.

(Id. ¶ 223.)  The charge of failure to carry out a proper order was based on "his failure to correct and submit a required PCT for May pay period, despite being instructed to do so on three occasions."  (Id. ¶ 224.)  The charge of failure to follow established call off procedures "was issued to Ganoe for not specifying the type of leave he was utilizing following his return from a 14-day suspension, which was partially based upon his prior refusal to follow the DLA's established call off procedure."  (Id. ¶ 225.)

The notice of proposed removal noted that, due to the severity and repeated nature of Plaintiff's offenses, his supervisor had lost confidence in Plaintiff's ability to successfully perform his duties.  (Id. ¶ 228.)  The notice also articulated that the "severity and repeated nature of Ganoe's misconduct separates his case from other employees charged with similar offenses."  (Id. ¶ 229.)  Plaintiff's removal was proposed in accordance with the DLA discipline policy— "DLA 1426.01"—and the removal was consistent with the table of recommended penalties therein.  (Id. ¶ 230.)

Plaintiff submitted a memorandum of record in response to the notice of proposed removal, providing responses to each of the incidents articulated in support of the charges against him.  (Id. ¶¶ 231–38.)  On November 19, 2018, the deciding official, Jeannine Taylor, the Deputy Director of DLA Human Resources Services, removed Plaintiff from his position effective immediately based upon the notice of proposed removal.  (Id. ¶ 239.)  Upon consideration of Plaintiff's reply to the charges in the notice, Ms. Taylor sustained all of the charges.  (Id. ¶ 249.)  Ms. Taylor found that Plaintiff's repeated misconduct, despite the prior

17

letter of reprimand and 14-day suspension, was extremely serious.  (Id. ¶ 250.)  She concluded

that the proposed penalty was consistent with DLA policy.  (Id. ¶ 252.)[13]  Ms. Taylor also, in

considering whether the proposed penalty was consistent with penalties issued to other

employees for the same or similar offenses, found that the severity and repeated nature of

Plaintiff's misconduct separated his case from other employees charged with similar offenses.

(Id. ¶ 253.)[14]  Ms. Taylor, the deciding official, thus determined that Plaintiff's removal was

appropriate and necessary to maintain discipline in the organization and promote the efficiency

of federal service.  (Id. ¶ 256.)

Joshua Hess, who was approximately 20 years younger than Plaintiff, replaced him as a

"General Supply Specialist (Training instructor)" effective March 31, 2019.  (Id. ¶¶ 257–58.)

## II.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute

---

[13]  Plaintiff purports to deny the facts set forth in this paragraph, but his denial does not actually deny their substance.  He states: "DLA Director and Deputy Director supported the cover-up of the inappropriate conduct of Senior management and supervisors" (Doc. No. 107 ¶ 252) and cites to his own affidavit in which he states without citation to the record that "I filed for numerous FOIA's, and the agency was not responsive and consistently altered their reasoning and justification for not providing the requested FOIAS on both of my requests" (Doc. No. 107-1 ¶ 126).  For the reasons articulated in previous footnotes, including with respect to Plaintiff's failure to comport with Local Rule 56.1, the Court will deem the facts set forth in this paragraph admitted.  See Perkins v. City of Elizabeth, 412 F. App'x 554, 555 (3d Cir. 2011) (unpublished) (stating that "a court is not obliged to scour the record to find evidence that will support a party's claims" and that when "parties fail to support their claims with adequate citations to the record, they risk having those claims rejected, as was rightly done here").

[14]  Plaintiff asserts the same denial as for the previous paragraph, and the Court will deem the facts set forth in this paragraph admitted for the same reasons.

is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Furthermore, a party may not

19

defeat a motion for summary judgment with evidence that would not be admissible at trial.  See

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

### III.   DISCUSSION

#### A.   Age Discrimination

Plaintiff alleges that he was "terminated from his federal employment because of his age,

disability, and/or for having engaged in protected EEO and whistleblower activities" (Doc. No. 1

¶ 5) and asserts an age discrimination under the ADEA (id. at 7).  Under the ADEA, an employer

is prohibited from discharging or otherwise discriminating against any individual "with respect

to his compensation, terms, conditions, or privileges or employment, because of such

individual's age."  See 29 U.S.C. § 623(a)(1).  To prevail on an ADEA claim, a plaintiff must

establish that age was the "but-for" cause of the adverse employment action at issue.  See Willis

v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citing Gross v. FBL

Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009)).  A plaintiff can sustain a claim of discrimination

under the ADEA by presenting either direct or circumstantial evidence of discrimination.  See

Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001).  Where a plaintiff relies on

circumstantial evidence, the Court reviews age discrimination claims pursuant to the three-part

framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).

See Willis, 808 F.3d at 644.

Under the McDonnell Douglas framework, a plaintiff bears the initial burden of

establishing a prima facie case of discrimination.  See Keller v. Orix Credit All., Inc., 130 F.3d

1101, 1108 (3d Cir. 1997) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1997)).  When a

plaintiff satisfies the elements of a prima facie case, that creates an "inference of unlawful

discrimination."  See Willis, 808 F.3d at 644 (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d

20

344, 357 (3d Cir. 1999)).  The elements of a prima facie case of age discrimination are: (1) the

plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3)

the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately

replaced by another employee who was sufficiently younger so as to support an inference of a

discriminatory motive.  See Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).  Where

the plaintiff is not directly replaced, the fourth element may be satisfied if the plaintiff can

provide facts which "if otherwise unexplained, are more likely than not based on the

consideration of impermissible factors."  See Pivirotto, 191 F.3d at 352.

"Once the plaintiff has successfully established a prima facie case creating an inference

of discrimination, the burden shifts to the employer who must 'articulate a legitimate, non-

discriminatory reason for the adverse employment action.'"  See Willis, 808 F.3d at 644 (quoting

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)).  At this stage, the employer is

not required to prove that the articulated legitimate, non-discriminatory reason was the actual

reason for the adverse employment action, but need only provide evidence that would allow a

factfinder to determine that the decision was made for non-discriminatory reasons.  See Fuentes

v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  If the employer satisfies this prong, the burden

shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's

proffered non-discriminatory reason was pretextual.  See Burton, 707 F.3d at 726–27.  In order

to survive summary judgment when an employer has articulated a legitimate, nondiscriminatory

reason for its employment action, a plaintiff must adduce some evidence that would allow a

factfinder to reasonably either "(1) disbelieve the employer's articulated reasons; or (2) believe

that an invidious discriminatory reason was more likely than not a motivating or determinative

cause of the employer's action."  See Simpson, 142 F.3d at 644 (citing Fuentes, 32 F.3d at 764).

To establish pretext based on disbelief, a plaintiff's evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to allow a factfinder to conclude that the employer's actions could not have been taken for non-discriminatory reasons. See Fuentes, 32 F.3d at 759. In the alternative, to establish pretext based on the argument that a discriminatory reason was "more likely than not a motivating or determinative cause," a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor." See Simpson, 142 F.3d at 644-45 (citing Keller, 130 F.3d at 1111). Specifically, a plaintiff must point to evidence demonstrating that (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. See Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765).

Defendant does not contest that Plaintiff "was over 40 years old, removed, and replaced by someone younger than him and qualified for the Training instructor position." (Doc. No. 101 at 14.) However, Defendant asserts that it is entitled to summary judgment with respect to Plaintiff's age discrimination claim under the ADEA because Plaintiff "cannot meet his burden of demonstrating that his age was considered, let alone the but-for cause for any decision to remove him." (Id.) Specifically, "the undisputed record reveals [that Plaintiff] was removed due to his continuous pattern of unprofessional conduct towards his co-workers and supervisors, frequent derogatory communications to his supervisors, and refusal to follow DLA required procedures." (Id.)

In response, Plaintiff argues that the record:

22

> establishes that there was resentment as to travel accommodations due to disability, and that remarks were made about slowing the team down. Clearly, the only way in which the team would be slowed down is some combination of age and disability, completing the prima facie case for disability discrimination, as Defendant acknowledges that Plaintiff is qualified and can perform the essential functions with reasonable accommodation.

(Doc. No. 108 at 7–8.)[15]  Plaintiff does not point to any record evidence of the alleged resentment or referenced remarks, which, in any case, would appear to bear primarily upon alleged disability discrimination, not age discrimination.  As to Defendant's proffered reasons for Plaintiff's termination, Plaintiff argues that Defendant "lays out a string of warnings and discipline over items solely encompassing what would be termed on the street a lack of respect, and not misconduct or shortcomings in job performance."  (Id.)  Plaintiff also asserts that:

> Plaintiff's Affidavit calls into extreme doubt the accounts of derogatory remarks and profanity in that the terms Plaintiff was accused of using are not terms that he would have used even if he had used profanity or derogatory speech, and therefore the discipline was likely not only pretextual, but possibly manufactured. The alleged disrespectful communications to supervisors was mild sarcasm at worst, and, in any event, use of sarcasm and/or profanity, while not to be completely condoned, was not a frequent or frequently cited event, until 2017, when it supposedly occurred three times. Even so, discipline instances mostly averaged approximately one time per year, which is unlikely to culminate, under normal circumstances, in termination. This sudden emphasis and piling-on of occurrences at once is highly suggestive of something pretextual, as is the hypersensitivity to use of a proper first name to refer to a supervisor.

(Id. at 10.)  In its reply, as to Plaintiff's assertion that "remarks were made about slowing the team down" (Doc. No. 108 at 7), Defendant counters that Plaintiff "cannot merely rely upon assertions in his legal memorandum, but must produce facts in the record to rebut" Defendant's motion (Doc. No. 114 at 25).  Further, "even if Ganoe could produce a statement or statements

---

[15]  Plaintiff appears to blend his arguments with respect to his age and disability discrimination claims.  In this section, the Court considers only his age discrimination claim and the arguments in support thereof.

about his age slowing the team down, he would need to offer evidence that the team slowing down was related to his removal, the adverse action here," and that "he has not, because he cannot." (Id.)

Upon careful consideration of the parties' briefs, the evidence of record, and the applicable law, and construing all evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's age discrimination claim. The parties agree that Plaintiff was at least forty years old, suffered an adverse employment decision, was qualified for the position in question, and was ultimately replaced by another employee who was sufficiently younger, therefore there is no dispute that the prima facie case for age discrimination is met. See Burton, 707 F.3d at 426.

Next, "the burden shifts to the employer who must 'articulate a legitimate, non-discriminatory reason for the adverse employment action.'" See Willis, 808 F.3d at 644 (quoting Jones, 198 F.3d at 412. At this second step, the Court finds that Defendant has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination. Defendant asserts that, over several years, Plaintiff "repeatedly engaged in misconduct by (i) calling his coworkers demeaning and derogatory names, (ii) using profanity, and (iii) sending numerous disrespectful communications to supervisors and management," and that Plaintiff "continuously refused to follow management's directions." (Doc. No. 101 at 26.)

The undisputed record contains a long list of incidents and disciplinary action involving Plaintiff. In November 2013, Plaintiff received an "oral admonishment" for, among other things, failing to attend meetings. (Doc. No. 102 ¶ 73.) In March 2014, Plaintiff was reprimanded for sending his supervisor a presentation titled "MY FAVORITE PHILOSOPHY @ DLA J1," with a slide that stated "[w]hile seeking revenge @J1, dig two graves—one for yourself, but theirs

first." (Id. ¶¶ 75–76.) On a separate occasion, Plaintiff received a letter of warning for sending an email to the acting branch chief that read "[t]hanks John but still does not answer my question but it does show what a 'Supervisor' should not do. Awesome job! Have a great day!" (Id. ¶¶ 83–84.) Plaintiff received another letter of warning after a customer complained that Plaintiff interrupted a class taught by another instructor (id. ¶ 87), and then another letter of warning when he failed to complete a required annual employee training as instructed (id. ¶¶ 117–19). Later, Plaintiff received a letter of reprimand when a co-worker, Shane Rapsey, reported that Plaintiff called him a "pussy ass bitch," which another co-worker corroborated. (Id. ¶¶ 123–24). Rapsey also said that Plaintiff called him an "asshole" and "ass kisser" (id. ¶ 125), and later reported Plaintiff for calling him "gay boy" (id. ¶ 138), which again was corroborated by another co-worker, who said Plaintiff also called Rapsey and a co-worker "Barbie bros" (id. ¶ 141). Separately, Plaintiff failed to comply with instructions from his supervisor on multiple occasions, including to communicate what kind of leave he was requesting (id. ¶¶ 152–63), to update certain course folders (id. ¶¶ 164–65), and to submit travel documents (id. ¶¶ 166–67).

For these and other alleged incidents, Plaintiff was suspended for 14 days on charges of unprofessional conduct and failure to carry out a proper order. (Id. ¶ 168.) Before serving his suspension, when a co-worker's computer froze during a training session, Plaintiff said the computer was not working "because of all the porn you watch on your computer." (Id. ¶ 189.) On the day that Plaintiff was set to return from his suspension, he texted his supervisor to say that he would not be in, but did not answer when his supervisor asked what kind of leave he was requesting. (Id. ¶¶ 193–95.) After his return, Plaintiff failed to update a "project code tracker" after his supervisor had instructed him on several occasions to make certain corrections. (Id. ¶¶ 212–13, 215–18, 220–21.) Subsequently, for these and other alleged incidents, the chief of DLA

25

Human Resources Services issued to Plaintiff a notice of proposed removal for unprofessional conduct, failure to carry out a proper order, and failure to follow established call-off procedures. (Id. ¶ 222.)  After considering the notice and Plaintiff's response, the deciding official, Jeannine Taylor, removed Plaintiff effective immediately and sustained each of the charges against him. (Id. ¶¶ 239, 249.)  Ms. Taylor concluded that his termination was consistent with DLA policy and that the severity and repeated nature of Plaintiff's misconduct separated his case from that of other employees charged with similar offenses.  (Id. ¶ 253.)

At the second step, the employer need not "prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action," but instead "provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons."  See Willis, 808 F.3d at 644.  The litany of asserted reasons listed above easily meets that burden.  See Bals v. Trump Nat'l Golf Club Colts Neck LLC, No. 14-cv-06055, 2016 WL 7325475, at *10 (D.N.J. Dec. 16, 2016) (finding that defendant had articulated legitimate, nondiscriminatory reasons, including plaintiff's "failing to follow directions, as well as being abrasive and confrontational," "making disrespectful comments," and "maintaining poor relationships with his fellow employees").

Moving to the third step, Plaintiff "must produce some evidence from which a reasonable factfinder could conclude that the employer's proffered reasons are pretextual," either by "discredit[ing] the employer's proffered non-discriminatory reasons" or by demonstrating "that the employer's actual reasons were discriminatory."  See Kern v. DAS Companies Inc., No. 24-2420, 2025 WL 2170324, at *6 (3d Cir. July 31, 2025) (unpublished) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998)).  Here, Plaintiff asserts that he incurred "warnings and discipline over items solely encompassing what would be termed on the street a lack of

26

respect" (Doc. No. 108 at 7), and points for support to his affidavit, which he claims "calls into extreme doubt the accounts of derogatory remarks and profanity" (id), although in his brief he does not cite any examples or reference any specific passages in support of this argument. Plaintiff perhaps refers to the allegation that he called a co-worker a "pussy ass bitch," which he disputes, asserting that "I don't use those words . . . together." (Doc. No. 107-1 ¶ 80.)  However, as the Court stated supra, Plaintiff does not actually dispute that his co-worker reported that Plaintiff called him a "pussy ass bitch," and Plaintiff admits that a separate co-worker reported hearing Plaintiff say "hey you pussy ass bitch" to the co-worker. (Doc. Nos. 102 ¶¶ 123–24, 107 ¶¶ 123–24.)  Plaintiff also does not dispute the reports that at various times he used the terms "asshole" and "ass kisser" (id. ¶ 125), "doofus" or "douche bag" or words to that effect (id. ¶ 126), "idiot" (id. ¶ 127), "gay boy" (id. ¶ 138), and "Barbie bros" (id. ¶ 141).  Furthermore, Plaintiff's notice of proposed removal was not just for unprofessional conduct, but also for failure to carry out a proper order, and failure to follow established call-off procedures.  (Id. ¶ 222.)  Plaintiff does not even attempt to point to record evidence that discredits these charges or the underlying undisputed facts, and as a result a reasonable factfinder would have no basis to conclude that Defendant's reasons for Plaintiff's termination are "unworthy of credence."  See Fuentes, 32 F.3d at 765 (internal citations omitted).

Plaintiff also asserts that his "alleged disrespectful communications to supervisors [were] mild sarcasm at worst" and regardless are "unlikely to culminate, under normal circumstances, in termination."  (Id. at 10.)  As described above, though, Plaintiff does not actually point to any disputes of material fact with respect to these many instances of reported disrespectful or unprofessional conduct.  Furthermore, Plaintiff "must do more than show that [Defendant] was wrong or mistaken," instead he must "present evidence contradicting the core facts put forward

by the employer as the legitimate reason for its decision." See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (internal citations omitted); see also McGrath v. Lumbermens Merch. Corp., 851 F. Supp. 2d 855, 861 (E.D. Pa. 2012) (granting summary judgment where "plaintiff has not pointed to any contradiction in the 'core facts' that undergird LMC's proffered reasons"). Here, with many of the core facts undisputed, Plaintiff does not even attempt to satisfy his burden to adduce evidence sufficient for "a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." See Fuentes, 32 F.3d at 764. Defendant offers support for each of the three charges that underlay Plaintiff's termination— unprofessional conduct, failure to carry out a proper order, and failure to follow established call-off procedures (Doc. No. 102 ¶ 222)—and Plaintiff only partially attempts to discredit the charge of unprofessional conduct, as discussed above. As in McGrath, "no reasonable jury could find that these justifications were conjured up post hoc as pretext because they have been on the uncontroverted record for years." See McGrath, 851 F. Supp. 2d at 861.

It is not the role of this Court "to assess the overall fairness of [Defendant's] actions," see Logue v. International Rehabilitation Associates, Inc., 837 F.2d 150, 155 (3d Cir. 1988), or to "second guess the method an employer uses to evaluate its employees," see Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005), and even were the Court to accept Plaintiff's argument that all of the discipline he faced was overly harsh or pretextual, Plaintiff would still fail to meet his burden to show that age was the actual motivating or determinative factor. See Simpson, 142 F.3d at 644-45 (citing Keller, 130 F.3d at 1111) (stating that a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor"); see also Berckeley, 455 F.3d at 201

28

(articulating that "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument"). Therefore, because Plaintiff fails to point to evidence from which a reasonable juror could conclude that the employer's proffered non-discriminatory reasons were pretextual, Defendant is entitled to summary judgment with respect to Plaintiff's age discrimination claim. The Court turns next to Plaintiff's disability discrimination claim.

## B.    Disability Discrimination

Plaintiff's disability discrimination claim arises under the Rehabilitation Act, which "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." See Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) (quoting Shiring v. Runyon, 90 F.3d 827, 830–31 (3d Cir.1996).

> To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must initially show, (1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job.

Id. (internal quotations omitted).[16] Next, "the familiar framework established in [McDonnell Douglas] for Title VII cases is equally applicable to discrimination claims under the

---

[16] Defendant points the Court instead to the standard in Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998), which is largely identical, except that it appears to collapse the burden-shifting framework into the prima facie case at step three:

> (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

See Gaul, 134 F.3d at 580 (emphasis added). The Court will refer to the Third Circuit's more recent formulation of the applicable test in Wishkin, but the different articulation would not change the outcome in the instant case.

29

Rehabilitation Act." See id. at 185.  Therefore, "plaintiff has the initial burden to make a prima facie showing of discrimination, but if s/he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action," whereafter "the plaintiff must cast [] sufficient doubt upon each of the legitimate reasons proffered by the defendant." See id. (internal quotations omitted).

Plaintiff recites in his complaint that he has the following "disabilities—asthma, neck and back conditions." (Doc. No. 1 ¶ 30.)  Defendant states that "[f]or the purposes of this summary judgment motion only, the DLA will concede that Ganoe had a disability based upon his neck and back conditions." (Doc. No. 101 at 23.)  However, Defendant asserts that there is no "evidence for a juror to conclude that Ganoe was removed from his position due to his alleged neck and back conditions" and "the undisputed record is devoid of any facts that Ganoe's alleged disability had any connection to his removal." (Id.)  Plaintiff argues in rejoinder that the record:

> establishes that there was resentment as to travel accommodations due to disability, and that remarks were made about slowing the team down. Clearly, the only way in which the team would be slowed down is some combination of age and disability, completing the prima facie case for disability discrimination, as Defendant acknowledges that Plaintiff is qualified and can perform the essential functions with reasonable accommodation.

(Doc. No. 108 at 7–8.)  Plaintiff does not cite to specific remarks or direct the Court to other evidence in the record.  Defendant asserts that Plaintiff "has neither provided any facts nor record evidence of the resentment of travel accommodations based upon a [disability]" in particular "what disability was mentioned, whose disaibility [sic] was mentioned, who had the resentment, what was said, when, in what manner was resentment shown?" (Doc. No. 114 at 20.)

Upon careful consideration of the parties' briefing, the evidence of record, and the

applicable law, and construing all evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's disability discrimination claim. Because Defendant does not contest Plaintiff's disability status for purposes of this motion, and it is undisputed that Plaintiff was removed from his position, Plaintiff satisfies the prima facie case under Wishkin. However, as discussed at length supra, Defendant has articulated several legitimate, non-discriminatory reasons for Plaintiff's removal, and Plaintiff fails to raise a genuine dispute of material fact such that a reasonable factfinder could disbelieve each proffered reason. See Fuentes, 32 F.3d at 764 (describing that a plaintiff must adduce evidence sufficient for "a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action"). Although Plaintiff argues that the record establishes "resentment as to travel accommodations due to disability," he does not cite to any evidence in the record in support of his argument, and the Court finds none.[17]

---

[17] Having conducted an independent review of the record, the Court notes that, in paragraph 69 of his affidavit in support of his RSMF, Plaintiff states that:

> I was initially denied by him and Anderson because of my "reasonable accommodation" and I would slow the "Team" down. An employee made the comment (Rapsey) to just get me a wheelchair, but I blew it off because it was pointless to make a complaint because nothing would be done about it. That's been proven several times.

(Doc. No. 107-1 ¶ 69.) At the outset, it is not the Court's responsibility to scour the record to identify whether there is support for Plaintiff's arguments. See Perkins, 412 F. App'x at 555 (stating that "a court is not obliged to scour the record to find evidence that will support a party's claims" and that when "parties fail to support their claims with adequate citations to the record, they risk having those claims rejected, as was rightly done here"). Further, this paragraph of Plaintiff's affidavit appears to respond to asserted facts that Plaintiff does not even deny—Plaintiff either admits the asserted facts (SMF paragraphs 98–101) or does not deny them due to

The undisputed record demonstrates that Plaintiff received several accommodations: he was granted fifteen-minute breaks after every hour of driving for travel.  (Doc. No. 102 ¶ 67.) Plaintiff was also permitted to select flights with a one-hour layover after three hours of flying; the DLA adjusted his fitness hours during winter months so that he could go home and run five miles before sunset; and he was advised that he would not be assigned any overseas work assignments and that west coast courses would be assigned to other instructors.  (Id. ¶¶ 68–70.) In his time with DLA Training, since 2013, Plaintiff did not travel overseas, to the west coast, or to the central United States.  (Id. ¶ 72.)  By way of rejoinder, Plaintiff offers only conjecture and speculation.  See Wharton v. Danberg, 854 F.3d 234, 244 (3d Cir. 2017) (cleaned up) (stating that "speculation and conjecture may not defeat a motion for summary judgment").  Because the Court finds that Plaintiff fails to meet his burden to demonstrate that each of Defendant's proffered reasons are pretextual—and for the reasons discussed at length supra—Defendant is entitled to summary judgment with respect to Plaintiff's disability discrimination claim.  See Fuentes, 32 F.3d at 764.  The Court turns to Plaintiff's retaliation claim.

### C.      Retaliation

To establish a prima facie case of retaliation, "a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the

---

a lack of knowledge or memory (SMF paragraphs 96–97).  See (Doc. Nos. 102, 107, 107-1). Plaintiff cannot attempt to introduce a dispute of material fact by way of stray remarks in an affidavit in response to facts in the SMF that Plaintiff does not contest.  See Kirleis, 560 F.3d at 161 (stating that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment"); see also Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (citing Celotex, 477 U.S. at 325) (stating that "a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue").

protected activity and the adverse employment action.'"  See Moore v. City of Philadelphia, 461

F.3d 331, 340–41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d

Cir.1995)).  In order to establish the necessary causal connection under the third prong, "a

plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the

protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with

timing to establish a causal link."  See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259,

267 (3d Cir. 2007).

> If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."

Moore, 461 F.3d at 331 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d

Cir.1997)).

Defendant does not contest prongs one or two under Moore, but asserts that Plaintiff

"cannot, however, demonstrate the third element of a prima facie retaliation claim,"—the

requirement to show a causal connection between the participation in the protected activity and

the adverse employment action—because "the undisputed record shows there was more than two

years between [Plaintiff's] EEO activity and removal," thus there is "no inference of retaliation."

(Doc. No. 101 at 16.)

> Plaintiff argues in response that

> [i]n that the decisionmaker cited discipline that was within the time periods proximate to the EEO activity as the basis for termination, it is a reasonable inference that the termination would not have occurred but for each disciplinary assessment and is therefore a result of discrimination and retaliation.  In that complaints regarding the handling of complaints were made continually up and down the chain of command, it is inconceivable that the decisionmaker was

33

unaware of the existence of EEO or the IG complaints.

(Doc. No. 108 at 8.)  Further, Plaintiff asserts that Defendant's proffered reasons for his

termination are pretextual in that "it is a fair inference that [Plaintiff's] removal would not have

occurred but for those disciplinary actions corresponding so coincidentally with events related to

the EEO complaints, as well as the whistleblower complaints."  (Id. at 9–10.)  Further, he argues

that, to find that the reasons for his termination are not pretextual:

> such fact-finder would need to believe that somehow Mr. Ganoe changed from an
> exemplary award-winning employee to an employee who was constantly requiring
> discipline a couple months after he raised concerns about waste and abuse, and
> continuing through his EEO complaints, and finally culminating in the need to
> dismiss him shortly after publication of audit issues reflecting the types of concerns
> Mr. Ganoe had been raising.

(Id. at 9.)  In reply, Defendant asserts that "[i]f it was so obvious that Taylor, the decisionmaker

who removed Ganoe, was aware of his EEO activity or OIG complaint, one would think Ganoe

could proffer evidence of it," but "[t]ellingly, Ganoe has not."  (Doc. No. 114 at 22.)

Upon careful consideration of the parties' briefs, the evidence of record, and the

applicable law, and construing all evidence of record in the light most favorable to Plaintiff, the

non-moving party, the Court finds that Plaintiff fails to establish the prima facie case of

retaliation, and Defendant is entitled to summary judgment with respect to Plaintiff's retaliation

claim.  Defendant concedes the first two elements—that Plaintiff engaged in protected activity

and was subjected to adverse employment action—but asserts that the third element is not met

because there is no evidence of a "causal connection between his participation in the protected

activity and the adverse employment action."  See Moore, 461 F.3d at 341 (3d Cir. 2006)

(internal citations omitted).  As stated above, this element can be established by proving "either

(1) an unusually suggestive temporal proximity between the protected activity and the allegedly

retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."

See DeFlaminis, 480 F.3d at 267.  Defendant articulates two reasons that the causal connection

element is not met—first, because the "undisputed record shows there was more than two years

between [Plaintiff's] EEO activity and removal, there is no inference of retaliation here," and

second, "there is no evidence that Ganoe's 2016 EEO activity played any role in the decision to

remove him two years later."  (Doc. No. 101 at 16–17.)  It is undisputed that Plaintiff filed an

EEO complaint on April 4, 2016, in which he alleged that:

1. Management at DLA Training refused Ganoe training and/or development;
2. Management forced work assignments on Ganoe;
3. Management assigned junior (new) instructors to advanced/career developmental course;
4. Management assigned Ganoe more courses to instruct because of his known medical travel restrictions;
5. Management issued letters of counsel to Ganoe; and
6. Ganoe was denied special course or assignments without reasonable accommodations.

(Doc. No. 102 ¶ 38.)  Plaintiff was removed on November 19, 2018.  (Id. ¶ 239.)

As to the temporal proximity argument, the Court finds no unusually suggestive temporal

proximity here.  Plaintiff argues that:

[i]n that the decisionmaker cited discipline that was within the time periods proximate to the EEO activity as the basis for termination, it is a reasonable inference that the termination would not have occurred but for each disciplinary assessment and is therefore a result of discrimination and retaliation.

(Doc. No. 108 at 8.)  Defendant by contrast points to Brennan v. Norton, 350 F.3d 399, 424 (3d

Cir. 2003), in which a "twenty-one month time lapse between Brennan's protected activities and

Palazzola's charge [was deemed] too remote to support an inference of retaliation," and Thomas

v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003), in which the Third Circuit found no

unusually suggestive temporal proximity where "over three weeks passed between the complaint

35

and the termination letter." The temporal proximity here—between an April 2016 EEO complaint and a November 2018 termination—is far more remote, and the Court is persuaded that no unusually suggestive temporal proximity exists.[18]

As to Defendant's second argument, the Court agrees that Plaintiff proffers no evidence to support his claim that he was terminated in 2018 in retaliation for his protected activity. See Rzucidlo v. McHugh, 979 F. Supp. 2d 526, 534 (M.D. Pa. 2013) (in which Plaintiff could not establish that the reasons for his termination were pretextual where he "has failed to produce evidence that contradicts the core facts put forward by the defendant as the legitimate reason for his decision"). In particular, there is no evidence in the record to suggest that the decisionmaker, Jeannine Taylor, was aware of Plaintiff's EEO complaint. See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 415 (3d Cir. 1999) (affirming the district court's grant of summary judgment where plaintiff "produce[d] no evidence which could in any way be construed as showing any knowledge . . . of [Jones's] previous EEO filings"). In the absence of evidence to the contrary, Plaintiff argues simply that it is "inconceivable" that the decisionmaker would have been unaware. (Doc. No. 108 at 8.) However, as stated previously, "speculation and conjecture

---

[18]  Plaintiff also argues that "March 2016 was not the end date of activity" and that Plaintiff participated in "investigations involving other employees' discrimination claims in May and June of 2018." (Doc. No. 108 at 7.) For evidence, he cites to paragraph 128 of his affidavit in support of his RSMF, which reads: "[o]n December 19, 2018, I filed an appeal for my removal from federal employment, including my EEO whistleblower claims. A true and correct copy of an appeal for my removal from federal employment is attached hereto as Exhibit K." (Doc. No. 107-1 ¶ 128.) This paragraph makes no reference to other employees' whistleblower claims and is therefore unavailing on its face. Furthermore, the Court finds no reference to this paragraph of the affidavit in Plaintiff's RSMF, which, under Local Rule 56.1, must "include references to the parts of the record that support the statements." See L.R. 56.1. For these independent reasons, the Court will not consider this supposed evidence. Even assuming arguendo, however, that the Court were to consider it, such evidence would not change the Court's ultimate conclusion.

may not defeat a motion for summary judgment." See Wharton, 854 F.3d at 244. Thus, having found that Plaintiff fails to establish a prima facie case of retaliation, Defendant is entitled to summary judgment on this claim.[19] The Court turns to Plaintiff's hostile work environment claim.

### D.    Hostile Work Environment

A Plaintiff who asserts a hostile work environment claim must demonstrate that:

> (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

See Komis v. Sec'y of United States Dep't of Lab., 918 F.3d 289, 293 (3d Cir. 2019).[20]

Plaintiff, in his complaint, asserted that he "was subjected to a hostile and retaliatory work environment, resulting [sic] his removal from his federal employment because of his age—over 40; and/or his disabilities—asthma, neck and back conditions." (Doc. No. 1 ¶ 30.) Defendant, in support of its motion for summary judgment, argues that "the undisputed record is devoid of any evidence for a juror to believe that" Plaintiff was subject to a hostile work environment. (Doc. No. 101 at 41.) Plaintiff fails to respond to this argument. He does not

---

[19] Even assuming arguendo that Plaintiff could establish a prima facie case, the Court would find that his claim fails, in accordance with the McDonnell Douglas framework, for failure to rebut as pretextual Defendant's legitimate reasons for his removal, for the same reasons as discussed with respect to Plaintiff's age and disability discrimination claims.

[20] Courts apply the same standard to hostile work environment claims under Title VII, the Rehabilitation Act, and ADEA. See Malakoski v. Garland, No. 3:22-cv-00977, 2025 WL 565832, at *13 (M.D. Pa. Feb. 20, 2025) (applying the Title VII hostile work environment test to Rehabilitation Act claims); see also Slater v. Susquehanna Cnty., 465 F. App'x 132, 138 (3d Cir. 2012) (unpublished) ("We assume, without deciding, that the ADEA makes available a hostile work environment claim for age-based discrimination, analyzed under the same standards as a Title VII hostile work environment claim").

37

mention his hostile work environment claim in his brief in opposition to Defendant's motion for summary judgment.  See (Doc. No. 107).  As Defendant articulates, "the DLA argued that Ganoe could not meet the requirements of a hostile work environment claim based upon age, disability, or reprisal," which "Ganoe neither opposed nor addressed."  (Doc. No. 114 at 30.)  Defendant argues that it is therefore entitled to summary judgment because Plaintiff's "failure to address [the] claim 'in opposition to summary judgment or otherwise come forward with evidence to support the claim constitutes a waiver of that claim entitled Defendants to summary judgment.'" (Id. at 30–31) (quoting Rife v. Borough of Dauphin, 647 F. Supp. 2d 431, 441–42 (M.D. Pa. 2009).

Upon careful consideration of the parties' briefing, the evidence of record, and the applicable law, and construing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's hostile work environment claim.  Although Plaintiff fails to point to any record evidence or support his claim in any way, Defendant directs the Court to Plaintiff's prior EEO complaint: "Ganoe does not state any factual allegations supporting his hostile work environment claim in his complaint, but does cite to the EEO matter in which he raised such claim."  (Doc. No. 101 at 39 n.5.)  In that proceeding, Plaintiff had asserted that:

1. Management at DLA Training refused Ganoe training and/or development;
2. Management forced work assignments on Ganoe;
3. Management assigned junior (new) instructors to advanced/career developmental course;
4. Management assigned Ganoe more courses to instruct because of his known medical travel restrictions;
5. Management issued letters of counsel to Ganoe; and
6. Ganoe was denied special course or assignments without reasonable accommodations.

(Doc. No. 102 ¶ 38.)  Defendant contends now, and the Court agrees, that:

38

the undisputed record is devoid of any evidence for a juror to believe that Ganoe was denied training, forced to take work assignments, denied development courses, assigned courses against his medical restrictions, denied assignments without reasonable accommodations, or disciplined due to his age, disability, or protected activity.

(Doc. No. 101 at 41.)  The absence of such evidence is fatal to his claim.  He cannot meet his burden to demonstrate intentional discrimination, and certainly points to none that could be considered severe or pervasive.  See Komis, 918 F.3d at 293; see also Malakoski 2025 WL 565832, at *13 (in which the plaintiff failed to produce evidence that "his request for an accommodation . . . was the reason for any intentional discrimination or harassment").  As in Nitkin, Plaintiff "points to no concrete evidence to support" these statements.  See Nitkin, 67 F.4th at 571.  In that case, the Third Circuit affirmed the district court's grant of summary judgment as to a hostile work environment claim, finding that "[t]he District Court properly disregarded Nitkin's generalized assertions of harassing conduct."  See id. at 570.  As in that case, Plaintiff here "may not rely merely on vague statements to defeat summary judgment" and this Court will "exclude[] [Plaintiff's] general, unsubstantiated allegations."  See id. at 571 (internal citations omitted); see also Perkins, 412 F. App'x at 555 (stating that "a court is not obliged to scour the record to find evidence that will support a party's claims" and when "parties fail to support their claims with adequate citations to the record, they risk having those claims rejected, as was rightly done here").  Defendant is entitled to summary judgment with respect to Plaintiff's hostile work environment claim.[21]

---

[21]  In the alternative, Plaintiff's failure to offer any response amounts to abandonment of this claim.  See Confer v. Custom Eng'g Co., 952 F.2d 41, 44 (3d Cir. 1991) (finding that the "district court exercised sound discretion when it refused to consider arguments that, in effect, had been waived," which were not raised "in any of their summary judgment papers"); see also Coit v. Wynder, No. 1:22-cv-01277, 2025 WL 2656069, at *9 (M.D. Pa. Sept. 16, 2025) (stating that "Coit's failure to specifically address Defendants' motion to dismiss his general cruel-and-

### E.    Civil Service Reform Act Claim

Plaintiff also asserts a CSRA claim challenging his removal from federal service.  (Doc. No. 1 at 4–5.)  Under the statute, an agency may take an adverse action, such as removal, against an employee "only for such cause as will promote the efficiency of the service."  See 5 U.S.C. § 7513(a).  "An employee against whom an action is taken under this section is entitled to appeal to the Merit Systems Protection Board."  5 U.S.C. § 7513(d).

The CSRA sets forth specific procedures for complainants who pursue such an appeal in cases where they assert civil service claims blended with claims of discrimination: "5 U.S.C. § 7702 contains the statutory provisions directly addressing the procedural path of a mixed case— an adverse personnel action subject to appeal to the MSPB coupled with a claim that the action was motivated by discrimination."  See Butler v. West, 164 F.3d 634, 638 (D.C. Cir. 1999).[22]  Before describing the legal standard for review of CSRA claims, and applying it to the instant claim, the Court will provide an overview of the relevant law and describe the unusual posture of the claim before the Court.  The statutory scheme for pursuing a "mixed case" is relatively complex, as described in Butler:

> An employee who intends to pursue a mixed case has several paths available to her. At the outset, the aggrieved party can choose between filing a "mixed case complaint"[] with her agency's EEO office and filing a "mixed case appeal"[] directly with the MSPB. See 29 C.F.R. § 1614.302(b). By statute, the relevant agency EEO office and the MSPB can and must address both the discrimination claim and the appealable personnel action. See 5 U.S.C. § 7702(a). Should she elect the agency EEO route, within thirty days of a final decision she can file an appeal with the MSPB or a civil discrimination action in federal district court.[] See 29

---

unusual claim in his opposition brief constitutes a waiver or abandonment of this claim").

[22]  See also 29 C.F.R. § 1614.302 ("A mixed case appeal is an appeal filed with the MSPB that alleges that an appealable agency action was effected, in whole or in part, because of discrimination on the basis of race; color; religion; sex; national origin; disability; age; genetic information; or pregnancy, childbirth, or related medical conditions").

C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a). If 120 days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court. See 5 U.S.C. §§ 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2).

When a complainant appeals to the MSPB, either directly or after pursuing her claim with the agency EEO office, the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law. See 5 C.F.R. §§ 1201.41(b), 1201.111. The AJ's initial decision becomes a final decision if neither party, nor the MSPB on its own motion, seeks further review within thirty-five days. See 5 C.F.R. § 1201.113. However, both the complainant and the agency can petition the full Board to review an initial decision. Should the Board deny the petition for review, the initial decision becomes final, see 5 C.F.R. § 1201.113(b); if the Board grants the petition, its decision is final when issued. See 5 C.F.R. § 1201.113(c). At this point, the complainant again has a choice: within thirty days of receiving a final decision from the MSPB, she can either appeal the discrimination claim to the EEOC, see 5 C.F.R. § 1201.157, or appeal the entire claim (or any parts thereof) to the appropriate district court.[] See 5 U.S.C. § 7703(b), 5 C.F.R. § 1201.175, 29 C.F.R. § 1614.310(b). Finally, if the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court. See 5 U.S.C. § 7702(e)(1)(B).

Id. at 638–39. This last option is most relevant here. Defendant states that it "will concede that this Court has jurisdiction over Ganoe's mixed case appeal to the MSPB . . . as it was pending for more than 120 days before the MSPB without a decision." (Doc. No. 101 at 46 n.8.) Plaintiff agrees, stating that "Plaintiff brought the instant mixed case MSPB appeal to this Court after greater than 120 days before the MSPB without a decision, properly electing to seek judicial resolution of the pending claim." (Doc. No. 108 at 10.) As the Supreme Court has explained, this escape-hatch provision exists "to save employees from being held in perpetual uncertainty by Board inaction." See Kloeckner v. Solis, 568 U.S. 41, 54 (2012) (internal quotations omitted). Typically, when handling cases involving both discrimination claims and CSRA claims based upon the alleged discrimination, courts will apply a deferential review to the

41

CSRA claims and adjudicate the discrimination claims de novo.  See Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002) (stating that "[c]ourts that have addressed the issue uniformly apply the de novo standard of review only to the discrimination claims while other claims adjudicated before the MSPB are reviewed on the record"); see also Carr v. Reno, 23 F.3d 525, 528 (D.C. Cir. 1994) (articulating that "[w]e review de novo the MSPB's findings under the Rehabilitation Act, but we review its findings under the Civil Service Reform Act on the administrative record under an arbitrary and capricious standard").  Where courts are presented with CSRA claims brought via § 7702(e)(1)(B), however, there may not always be an MSPB decision to which to defer—"[t]he whole point of § 7702(e)(1)(B) is to permit judicial review where the MSPB fails to review a case."  See Clark v. Brown, 536 F. Supp. 3d 56, 65 (E.D. Va. 2021).  In that context, courts will sometimes stay the case or hold it in abeyance until there is a final decision.  See Ikossi v. Dep't of Navy, 516 F.3d 1037, 1043 (D.C. Cir. 2008) (describing that "the appropriate action in that situation is not to dismiss for lack of jurisdiction but rather to 'stay the case, or hold it in abeyance, for a reasonable period of time'") (quoting Butler, 164 F.3d at 643).

In the instant case, however, issuing a stay to await a final MSPB decision would be futile.  Neither party provides the Court with the relevant procedural history from the MSPB proceeding—Defendant merely states that "[h]ere, the MSPB did not issue a decision," (Doc. No. 101 at 46), and Plaintiff states that "the MSPB did not issue a decision" (Doc. No. 108 at 10).  Upon independent review, the Court was able to determine that the MSPB did not issue a decision because Plaintiff filed the instant lawsuit and thereafter acceded to the dismissal of his MPSB appeal.  The Court excerpts the relevant language from the decision below:

42

Prior to filing the instant appeal, the appellant had filed an individual right of action (IRA) appeal alleging that the agency had taken actions against him in retaliation for his protected activity. <u>Ganoe v. Department of Defense</u>, MSPB Docket No. PH-1221-18-0109-W-1. When this appeal was filed, the two appeals were joined for adjudication. IAF I, Tab 3.

While the appeals were pending, the Board suspended and dismissed them without prejudice several times for various reasons. IAF I, Tab 7; IAF II, Tabs 5, 6. On August 5, 2020, the appeals were refiled for the second time. On November 30, 2020, I severed the appeals and dismissed the IRA as withdrawn. <u>Ganoe v. Department of Defense</u>, PH-1221-18-0109-W-3 (Initial Decision, Nov. 30, 2020).

During a November 18, 2020 conference call, the parties informed me that the appellant has filed suit in U.S. District Court. IAF III, Tab 6. By agreement with the parties, I provided the agency with 14 days to file a motion to dismiss this appeal, and afforded the appellant 10 days from the date the motion was filed to respond. <u>Id.</u> The agency filed its motion to dismiss on November 30, 2020, and the appellant has not filed a response within the allotted time. *Id.*, Tab 8.

. . .

During the November 18, 2020 conference call referenced above, appellant's counsel indicated that appellant wished to pursue his claims before the federal Court, rather than the Board. I afforded the agency an opportunity to move for dismissal, and stated that if the appellant did not respond to the agency's motion to dismiss I would deem it a consent to dismiss the appeal. IAF III, Tab 6.

The deadline for a response to the agency's motion was December 10, 2020. Because the appellant has not responded within the time allotted, I find that he has consented to dismissal of this appeal. Accordingly, I must dismiss it.

<u>See</u> <u>Ganoe, Sr. Robert Lee v. Dep't of Def.</u>, No. PH-0752-19-0093-I-3, 2020 WL 7348373 (Dec. 11, 2020).

The instant CSRA claim is thus before the Court in an unusual posture—although CSRA claims are typically reviewed deferentially, there is no final decision to review, and while such cases are sometimes stayed to await such decision, the administrative proceeding has been dismissed and therefore no final decision will arrive. The Court has not found—and neither party points to—any cases in which a district court has adjudicated on the merits a CSRA claim,

applying a de novo standard of review, that arrived in this manner.  The parties only cursorily

refer to this unusual situation.  Plaintiff states that, because "the MSPB did not issue a decision,

deference is not required" (Doc. No. 108 at 10), while Defendant simply states that, "[w]hen the

MSPB issues a decision, the district court reviews such decision in accordance with 5 U.S.C. §

7703(c)," but "the MSPB did not issue a decision" here (Doc. No. 101 at 46 n. 8).

Still, after independent review of the relevant law, including the D.C. Circuit's decision

in Ikossi, the Court will apply de novo review to Plaintiff's CSRA claim.  In Ikossi:

> the MSPB's grant of Dr. Ikossi's motion to dismiss her mixed case does not, as the
> Secretary suggests, oust the district court of jurisdiction. Dr. Ikossi cannot be
> deemed to have abandoned her non-discrimination claims by filing a motion in her
> administrative proceeding after she had filed her civil suit; to the contrary, her
> motion was designed to avoid the burden of concurrently litigating the same claims
> before both the district court and the MSPB.

See Ikossi, 516 F.3d at 1044.  The facts are similar here.  After more than 120 days passed

without an MSPB decision, and after Plaintiff filed this lawsuit, he acceded to dismissal of his

MSPB mixed case appeal in order to pursue his claims together in district court.  See Clark, 536

F. Supp. 3d at 65 (stating that "[t]he whole point of § 7702(e)(1)(B) is to permit judicial review

where the MSPB fails to review a case—that is, where the MSPB fails to issue a judicially

reviewable action and to produce an administrative record").  The Court turns to an assessment

of the claim.

As cited above, under the CSRA, an agency may take an adverse action, such as removal,

against an employee "only for such cause as will promote the efficiency of the service."  See 5

U.S.C. § 7513(a).  The parties here agree upon the legal test that applies:

> When an agency takes adverse action against an employee, the agency must
> establish by a preponderance of the evidence that (1) the charged conduct occurred;
> (2) there is a nexus between the conduct and efficiency of service; and (3) the
> imposed penalty was reasonable.

44

See Robinson v. Dep't of Veterans Affs., 923 F.3d 1004, 1010 (Fed. Cir. 2019).  The nexus "limitation requires the agency to show by a preponderance of the evidence that the employee's misconduct is likely to have an adverse effect upon the agency's functioning."  See Mings v. Dep't of Just., 813 F.2d 384, 389–90 (Fed. Cir. 1987).  "We frequently have recognized in cases arising under the Civil Service Reform Act that [d]etermination of an appropriate penalty is a matter committed primarily to the sound discretion of the employing agency."  Beard v. Gen. Servs. Admin., 801 F.2d 1318, 1322 (Fed. Cir. 1986) (internal quotations omitted).

Plaintiff was charged with three grounds for removal; specifically, the chief of DLA Human Resources Services issued to Plaintiff a notice of proposed removal for unprofessional conduct, failure to carry out a proper order, and failure to follow established call-off procedures. (Doc. No. 102 ¶ 222.)  After considering the notice of proposed removal and Plaintiff's response, the deciding official, Jeannine Taylor, removed Plaintiff effective immediately and sustained each of the charges against him.  (Id. ¶¶ 239, 249.)  Ms. Taylor concluded that his termination was consistent with DLA policy and that the severity and repeated nature of Plaintiff's misconduct separated his case from that of other employees charged with similar offenses.  (Id. ¶ 253.)

Defendant argues that it can "prove by a preponderance of the evidence that Ganoe committed the misconduct he was charged with."  (Doc. No. 101 at 47.)  Plaintiff does not dispute this first element of the test, and the Court finds that Defendant meets its burden to establish that the charged conduct occurred.  As to the second element, the nexus between the conduct and the efficiency of the service, Defendant argues that "there is ample evidence to demonstrate [such] nexus."  (Id. at 50.)  In particular:

Ganoe's continued disparaging and offensive comments to co-workers, such as "ass-kisser", "pussy ass bitch", "gayboy", or accusing one of watching porn on the government computer, obviously impacts the DLA Training staff, their ability to perform their work, and their morale.

. . .

Likewise, Ganoe's repeated unprofessional conduct towards his supervisors and refusal to follow DLA orders is inherently disruptive and negatively impacts the DLA Training's ability to carry out its mission. Also, it inhibits DLA Training staff from effectively performing their duties.

(Id. at 50–51.)

Plaintiff, in rejoinder, states that "the removal was not calculated or necessary to promote efficiency of the service to any significant extent" and that the "greater and more logical nexus" was with "the OIG, EEO, and OSC activity." (Doc. No. 108 at 11.) Further, "[t]o the extent that Plaintiff's words may appear to become 'disrespectful,' later in his service, this was undoubtedly a result of frustration . . . and did not result in significant diminishment of 'efficiency of the service.'" (Id.) Given Plaintiff's extensive record of disparaging comments (including referring to co-workers as "asshole" and "ass kisser" (id. ¶ 125), "doofus" or "douche bag" or words to that effect (id. ¶ 126), "idiot" (id. ¶ 127), "gay boy" (id. ¶ 138), and "Barbie bros" (id. ¶ 141)), refusal or failure to comply with directives, and other disruptive behaviors, the Court is persuaded that Defendant has met its burden as to the requisite nexus. See Mings, 813 F.2d at 390 (sustaining the finding of the requisite nexus where the employee's "critical attitude regarding his superiors and co-workers cast grave doubts on the petitioner's ability to discharge his duties"). Among other examples, one co-worker described, in reference to Plaintiff's actions, that "walking on 'egg shells' and people not feeling comfortable in the office does not make for a good work environment." (Doc. No. 102 ¶ 145.)

46

As to the third factor, Defendant asserts that Plaintiff's "continued misconduct and repeated refusal to follow orders warrants removal," and that "the DLA's judgment has been properly exercised and Ganoe's removal was reasonable." (Doc. No. 101 at 51–52.) Plaintiff contends that the "penalty imposed was not reasonable" and that it was "disproportionate to the actual conduct underlying the charges, which consisted primarily of saying things which supervisors claimed to find offensive and that ordinary people would not." (Doc. No. 108 at 12.) The Court is persuaded that, here too, Defendant has met its burden. The deciding official, Ms. Taylor, upon review of the notice of Plaintiff's proposed removal, concluded that the proposed penalty was consistent with DLA policy. (Id. ¶ 252.) Ms. Taylor also, in considering whether the proposed penalty was consistent with penalties issued to other employees for the same or similar offenses, found that the severity and repeated nature of Plaintiff's misconduct separated his case from other employees charged with similar offenses. (Id. ¶ 253.) This is particularly persuasive given that "[d]etermination of an appropriate penalty is a matter committed primarily to the sound discretion of the employing agency" see Beard, 801 F.2d at 1322, and Plaintiff has supplied no evidence to call into doubt this conclusion. Accordingly, upon careful consideration of the parties' briefing, the record, the applicable law, and for the foregoing reasons, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's CSRA claim. The Court turns to Plaintiff's whistleblower claim.

**F.      Whistleblower Protection Act Claim**

Lastly, Plaintiff asserts a claim under the WPA, at 5 U.S.C. § 2302(b)(8)(A), which provides that:

> [a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . take or fail to take, or threaten to take or fail to take, a personnel action with respect to any

> employee or applicant for employment because of . . . any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences . . . any violation of any law, rule, or regulation, or [] gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

See 5 U.S.C. § 2302(b)(8)(A).  The process for bringing such a claim is as follows:

> [a]n employee who believes he has been the victim of a prohibited personnel practice must first complain to the OSC, which is required to investigate the complaint "to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred." 5 U.S.C. § 1214. If the OSC determines that a prohibited personnel practice has occurred, it must report its findings to the Merit Systems Protection Board (MSPB), and it may petition the Board to take action on behalf of the employee. But even if the OSC's investigation does not support the complaint, the employee still may bring an individual action before the MSPB. See 5 U.S.C. § 1221. In either case, the MSPB's decision is appealable to the Federal Circuit. See 5 U.S.C. § 7703.

See Weber v. United States, 209 F.3d 756, 758 (D.C. Cir. 2000).  "Under no circumstances does the WPA grant the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance."  Stella v. Mineta, 284 F.3d 135, 142 (D.C. Cir. 2002).

The Court finds that Plaintiff has failed to meet his burden to demonstrate that the Court has jurisdiction over the WPA claim.  See Montgomery v. Mayorkas, No. 23-cv-03931, 2024 WL 4973406, at *4 (D.D.C. Dec. 4, 2024) (finding that "[r]egarding his removal and whistleblower claims, plaintiff has failed to carry his burden [to] establish[] the facts that support jurisdiction by a preponderance of the evidence") (internal quotations omitted).  As an initial matter, Plaintiff does not demonstrate that the WPA claim is part of his "mixed case," which the Court discussed at length with respect to Plaintiff's CSRA claim, supra.  See Kloeckner v. Solis, 568 U.S. 41, 46 (2012) (stating that the "'cases of discrimination' in § 7703(b)(2)'s exception, in other words, are mixed cases, in which an employee challenges as discriminatory a personnel

48

action appealable to the MSPB"). Such "mixed cases" are properly brought in district court because the "enforcement provisions of the antidiscrimination statutes listed in [§ 7703(b)(2)] all authorize suit in federal district court." See id. Importantly, though, Plaintiff does not assert his WPA claim on the basis of purported discrimination, but in response to alleged retaliation for whistleblower activity. Such retaliation was not, then, based on the discrimination. See id. at 44 (stating that when "an employee complains of a personnel action serious enough to appeal to the MSPB and alleges that the action was based on discrimination, she is said (by pertinent regulation) to have brought a 'mixed case'") (emphasis in original); see also Perry, 582 U.S. at 446 (Gorsuch, dissenting) (stating that the phrase "mixed case" "is but lingo [from] the applicable regulations . . . [a]nd even those regulations don't say that civil service questions may go to district court . . . from [§ 7703(b)(2)] we know that only cases of discrimination . . . filed under certain specified federal antidiscrimination statutes go to district court—no more, no less") (internal quotations omitted). This helps to explain why, having undertaken a review of the case law, the Court finds that WPA claims are channeled nearly unanimously to the Federal Circuit or the circuit courts, pursuant to the relevant statutory scheme. See 5 U.S.C. § 7703 (stating that except as provided, "a petition to review a final order or final decision of the Board shall be filed in the United States Court of Appeals for the Federal Circuit" and that a "petition to review a final order or final decision of the Board that raises no challenge to the Board's disposition of [certain] allegations of a prohibited personnel practice . . . shall be filed in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction"); see also Andrews v. Mayorkas, No. 18-cv-00315, 2022 WL 19297053, at *6 (D.D.C. Mar. 28, 2022) (holding that "[t]o the extent that Plaintiff has brought claims premised on personnel decisions unrelated to unlawful discrimination, such as . . . whistleblower activity . . . the foregoing

49

statutory schemes deprive this district court of jurisdiction"); see also Webster v. U.S. Dep't of Energy, 267 F. Supp. 3d 246, 270 (D.D.C. 2017) (stating that "Plaintiff's allegations regarding retaliation under Title VII is distinct from her whistleblower retaliation claims brought under the WPA").

Although Plaintiff only summarily addresses his pursuit of administrative remedies, and there is very little evidence of such proceedings in the record, the Court finds the proceedings telling as well. Plaintiff appears to have pursued two separate MSPB cases—one involving his mixed case appeal and one involving a whistleblowing individual right of action ("IRA"). See Schlottman v. Perez, 739 F.3d 21, 23 (D.C. Cir. 2014) (stating that "[u]nder the whistleblower route . . . [i]f the OSC dismisses the complaint, the individual must file an appeal—known as an Individual Right of Action (IRA)—with the MSPB"). Plaintiff's whistleblower IRA appeal appears to have been dismissed without prejudice twice. See Ganoe, Sr., Robert Lee v. Dep't of Def., No. PH-1221-18-0109-W-1, 2019 WL 4138084 (Aug. 30, 2019) ("I hereby dismiss this appeal without prejudice to allow the appellant's representative additional time to review the appeal"); see also Ganoe, Sr. Robert Lee v. Dep't of Def., No. PH-1221-18-0109-W-2, 2020 WL 3638315 (June 30, 2020) ("I hereby dismiss this appeal without prejudice to allow the parties to conclude discovery and related matters"). This IRA only appears to have then been consolidated with the mixed case appeal in the latter stages, at which point Plaintiff acceded to the dismissal of the joint appeal:

> Prior to filing the instant appeal, the appellant had filed an individual right of action (IRA) appeal alleging that the agency had taken actions against him in retaliation for his protected activity. Ganoe v. Department of Defense, MSPB Docket No. PH-1221-18-0109-W-1. When this appeal was filed, the two appeals were joined for adjudication. IAF I, Tab 3.
>
> . . .

50

During a November 18, 2020 conference call, the parties informed me that the appellant has filed suit in U.S. District Court. IAF III, Tab 6. By agreement with the parties, I provided the agency with 14 days to file a motion to dismiss this appeal, and afforded the appellant 10 days from the date the motion was filed to respond. Id. The agency filed its motion to dismiss on November 30, 2020, and the appellant has not filed a response within the allotted time. *Id.*, Tab 8.

. . .

During the November 18, 2020 conference call referenced above, appellant's counsel indicated that appellant wished to pursue his claims before the federal Court, rather than the Board. I afforded the agency an opportunity to move for dismissal, and stated that if the appellant did not respond to the agency's motion to dismiss I would deem it a consent to dismiss the appeal. IAF III, Tab 6.

The deadline for a response to the agency's motion was December 10, 2020. Because the appellant has not responded within the time allotted, I find that he has consented to dismissal of this appeal. Accordingly, I must dismiss it.

See Ganoe, Sr. Robert Lee v. Dep't of Def., No. PH-0752-19-0093-I-3, 2020 WL 7348373 (Dec. 11, 2020). Plaintiff does not point the Court to the administrative record from either proceeding, nor does he proffer any evidence to demonstrate that these parallel appeal tracks truly constituted a single proceeding. In a comparable situation, a district court found that it did not have jurisdiction over a WPA claim that had initially been brought on a separate track to the MSPB, but was consolidated and then brought in district court as part of one complaint:

Robb brought two separate complaints to the MSPB, which were consolidated for a final hearing before the Board and then brought together to this Court. One complaint, now Count VI, only alleged whistleblower retaliation. In that complaint, Robb claimed to have faced numerous adverse actions such as workstation reassignment, suspension, and revocation of her telework agreement as reprisals for her whistleblowing activity. Mot. at 3. The other complaint, now Counts I through V, revolved around Robb's removal from federal service and included allegations of Title VII and Rehabilitation Act violations. See Termination Compl.

This Court lacks subject matter jurisdiction to hear Count VI because it is a standalone whistleblower claim, not a mixed claim. As a standalone whistleblower claim, it must be filed directly in a federal court of appeals. Bell v. Esper, Civ. A. No. 18-cv-2277 (RC), 2019 WL 6910032, at *3 (D.D.C. Dec. 19, 2019). And Robb

51

did not even bother to address this issue in her opposition to summary judgment and her objections to Judge Harvey's report.

See Robb v. Rollins, No. 21-cv-02056, 2025 WL 2851638, at *13 (D.D.C. Oct. 8, 2025).

Likewise, upon careful consideration of the parties' briefs, the evidence of record, and the applicable law, this Court finds that it lacks jurisdiction over Plaintiff's whistleblower claim.

Therefore, the Court will dismiss Plaintiff's whistleblower claim without prejudice to Plaintiff's ability to re-file the claim in a proper forum.[23]

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment (Doc. No. 100) as to Counts I (CSRA) and III (age discrimination, disability discrimination, retaliation, and hostile work environment), and Count II (WPA) will be dismissed for lack of jurisdiction.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[23]  Furthermore, even if the Court had jurisdiction, Plaintiff does not point the Court to evidence in the record to demonstrate that Plaintiff has exhausted his administrative remedies.  See Stella, 284 F.3d at 142 (detailing the channeling of WPA claims).  Plaintiff made two complaints to the OIG (Doc. No. 102 ¶¶ 6–37), and asserts that "[b]ecause his reports were not taken seriously and/or acted upon . . . Plaintiff ultimately filed a claim with the Office of Special Counsel" (Doc. No. 1 at 6).  The OSC's findings do not appear to be included in the record.  Plaintiff attached as an exhibit to his complaint the OSC's preliminary determination letter denying his claim (Doc. No. 1-8 at 2) but he does not appear to include a final determination or the administrative record or findings from subsequent MSPB proceedings.

52